IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DE LAGE LANDEN OPERATIONAL     :        CIVIL ACTION
SERVICES, LLC                  :
                               :
        v.                     :
                               :
THIRD PILLAR SYSTEMS, INC.     :        NO. 09-2439

MEMORANDUM INCLUDING FINDINGS
OF FACT AND CONCLUSIONS OF LAW

Bartle, C.J.                                    March 5, 2010

        Plaintiff De Lage Landen Operational Services, LLC
("DLL") has sued defendant Third Pillar Systems, Inc. ("Third
Pillar") for breach of contract, violation of the California
Uniform Trade Secrets Act, unjust enrichment, and promissory
estoppel.[1]  Before the court is plaintiff's motion for a
permanent injunction.

        DLL engaged Third Pillar, a software development
company, to design software for DLL's financial leasing business
operations.  DLL contends that it divulged propriety information
about its leasing business to Third Pillar in the form of use
cases and that Third Pillar was in breach of their contract by
disclosing those use cases to other customers and by
incorporating the information contained therein into software for

_____

1.  DLL's complaint also originally included a separate claim for
injunctive relief, which this court dismissed.  The prayer for
injunctive relief in connection with the other claims, of course,
remains.

other customers.  Third Pillar denies any misuse of DLL information.  Instead it maintains that it owns the use cases in question and the resulting software.

Plaintiff DLL moved for a preliminary injunction to enjoin Third Pillar from using or disclosing any of its confidential information, proprietary materials and work product, as well as to require Third Pillar to return to DLL all of those materials.  Thereafter, the parties agreed to forego a hearing for a preliminary injunction and to proceed directly to a hearing for a permanent injunction.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Venue is proper under 28 U.S.C. § 1391(a) as a substantial portion of the events giving rise to the causes of action described herein occurred in the Eastern District of Pennsylvania.

The following are the court's findings of fact and conclusions of law.

I.

DLL is a vendor finance company, organized under the laws of Pennsylvania with its principal place of business in Wayne, Pennsylvania.  It is in the business of leasing and financing equipment to retail customers through equipment manufacturers, distributors, and dealers ("DLL partners").

In vendor finance, a retail customer can obtain financing for a large purchase from an unseen lender through the retail dealer.  The latter transmits customer information to the vendor finance company, which then decides whether to extend credit to the customer and what terms to offer.  The vendor finance company purchases the item from the dealer and leases it back to the customer immediately.  Frequently, the customer does not know that a vendor finance company is behind the financing of the equipment.

In order to process the lease applications submitted to it, DLL maintained various computer systems across multiple geographic business divisions.  In 2001, DLL commenced a project to analyze how it could consolidate these systems into a single uniform system.  DLL's effort, named the "Beacon Project," sought to create a new enterprise-wide software system that could standardize and automate its entire business process.[2]

Third Pillar is a software development company, organized under the laws of California with its principal place of business in San Mateo, California.  It has developed a software system designed to originate commercial leases and commercial loans, called LoanPath 2.4 ("LoanPath").  LoanPath is an enterprise credit underwriting and management platform.

---

2.  DLL initially sought a single system to run the entire Beacon Project.  After further analysis of the available software options, DLL decided to use Oracle Lease Management for their "back office processes" (such as accounting and collections) and use a different vendor to create software for their "front office processes" (such as quoting and lease generation).

LoanPath is composed of individual applications entitled EAVE, Genie, and Wintip and additional underwriting and placement modules. Third Pillar's first LoanPath customer was GE Capital, which used LoanPath to process credit applications for approximately 40 different types of loans and leases.

DLL selected Third Pillar as its software vendor for the Beacon Project front office processes based on LoanPath's configurable platform and Third Pillar's price. On July 23, 2004, DLL and Third Pillar entered into a Global Master Professional Services Agreement ("Services Agreement") in which Third Pillar agreed to provide "design, configuration, installation, implementation and other services" related to LoanPath. The Services Agreement dictated that all specific services would be set forth in statements of work called "Task Orders." The Services Agreement provided:

> Except as otherwise specifically provided in a Task Order, (i) each Task Order shall be governed by the terms of this Agreement, and (ii) in the event of a conflict between the terms of the body of this Agreement and the terms and conditions set forth in a Task Order, the terms set forth in the body of this Agreement shall control.

The Services Agreement included several provisions related to intellectual property rights. Section 10.1 set forth DLL's retention of full ownership rights to all "Proprietary Materials." The Services Agreement provided:

> Except as otherwise set forth in a Task Order, Customer [DLL] shall retain all right, title and interest in and to all Customer materials, content and information supplied

by Customer to Third Pillar in connection
with the Services hereunder ("Customer
Proprietary Materials").  Customer hereby
grants to Third Pillar the right to use,
modify and exploit the Customer Proprietary
Materials on behalf of Customer solely to the
extent necessary for Third Pillar to provide
the Services.

DLL also retained all ownership to any Third Pillar work product

created in connection with the services rendered under § 10.2 of

the Services Agreement.  Section 10.2 specified:

Except for Third Pillar's pre-existing know-
how, works and other materials and
improvements, modifications and derivative
works of such know-how, works and other
materials, and except as otherwise set forth
in a Task Order, all designs, specifications,
inventions, works, improvements, know-how,
techniques, materials, flow charts, notes,
outlines, lists, compilations, works,
writings, pictorial materials, schematics,
and items created, developed or supplied by
Third Pillar in connection with the Services
(collectively, "Work Product") shall be
deemed "works made for hire."  To the extent
that any of the Work Product may not, as a
matter of law, be deemed a work made for
hire, Third Pillar hereby assigns to Customer
[DLL] all right, title and interest in the
Work Product...

Finally, the Services Agreement also contained confidentiality

and nondisclosure provisions in §§ 11.1-11.5 barring each party

from the use of the other's "confidential information" for any

purpose other than the agreed-upon services.

On August 14, 2004, DLL and Third Pillar signed a

Global Master Software License Agreement ("License Agreement").

Under this agreement, Third Pillar licensed the LoanPath software

to DLL in object code form.[3]  Object code is a binary format that computers can read but people cannot.  It is sometimes also referred to as the "executable" version of the software.

The License Agreement stated that Third Pillar would retain ownership of the pre-existing LoanPath software.  Under § 2.4, DLL acknowledged that Third Pillar might design new components to LoanPath and that any of its suggestions to Third Pillar about "any new features, functionality or performance" that were incorporated into LoanPath 2.4 would be the "sole and exclusive property of Third Pillar and all such suggestions shall be free from any confidentiality restrictions that might otherwise be imposed upon Third Pillar."

Attached to the License Agreement as Exhibit A-3 was the "LoanPath 2.4 Specifications," which stated, "Third Pillar Systems' LoanPath platform is a flexible, modular software platform designed to manage the credit origination process."  It listed the following applications modules to be included in the final Beacon software:  Credit Application and Quoting; Program Management; Approvals and Credit; Document Generation and Contracts; Pricing; and Delegated Administration.  The specifications also set forth that, "Third Pillar will include all Third Pillar developed components developed to meet DLL

_____

3.  DLL and Third Pillar also entered into a Global Master Software Hosting Services Agreement and a Global Software Maintenance and Support Agreement.  These contracts are not in issue in this case.

Beacon functional specifications into the LoanPath 2.4 product specification."

On November 30, 2004, DLL and Third Pillar signed Task Order 2, which was the first statement of work for the Beacon project.[4] Under this Task Order, Third Pillar agreed to "complete a Front-End software application that substantially meets" the DLL requirements that were attached to the Task Order. The requirements were generic descriptions of individual business processes.

Under the terms of Task Order 2, DLL was obligated to prepare "Level 3 use cases" for Third Pillar programmers. Use cases are detailed narratives describing how a business specifically implements each of its requirements and how that requirement fits into its business process. For each requirement, DLL was to prepare a use case, which would detail the complete end-to-end workflow that occurred at DLL, including information such as the routing of documents and the data profiles that DLL used. Only DLL employees could draft these "Beacon use cases" because they were the only people who knew DLL's specific business processes and methods. Under Task Order 2, Third Pillar was responsible for providing "guidance, feedback and input" on the drafted use cases based on its understanding of the LoanPath software.

---

4. Task Order 1A was an agreement between DLL and Third Pillar about services for DLL's Australia division. It is not at issue in this case.

Task Order 2 also contained an intellectual property clause. It provided:

> Notwithstanding anything set forth in the body of the Agreement to the contrary, except with respect to the Customer-Retained Work Product, Third Pillar shall own and have the right to re-use in other client engagements all Work Product ... created, developed or supplied by Third Pillar in connection with this Task Order.

Third Pillar assigned to DLL "all right, title and interest in the Customer-Retained Work Product," which was defined as:

> (i) Work Product that implements requirements provided by Customer under this Task Order if Customer expressly notifies Third Pillar in writing that Customer desires to obtain ownership of such requirements and not permit Third Pillar to use in implementations of Third Pillar's LoanPath software for other customers,
> (ii) The design of the client/dealer user interface, including the @oncefinance one page application and the meter read entry view, to the extent the design is created by Third Pillar in connection with this Task Order,
> (iii) The logos and other branding elements applied to the client/dealer user interface,
> (iv) Credit or behavioral scoring models, designs, specifications or processes, and
> (v) Existing Customer Program Agreement designs or specifications.

On the same day as the parties executed Task Order 2, they also executed Amendment No. 1 to the Services Agreement. Under this Amendment, the parties agreed to add to § 10 of the Services Agreement the following clause:

> [DLL] understands that Third Pillar will be engaged, directly and indirectly, in providing services to Customer [DLL] and its affiliates in the United States, Europe and elsewhere and, as part of providing such

> services, will receive information regarding
> DLL's system requirements ("Requirements
> Information").  Third Pillar shall keep
> confidential the Requirements Information in
> accordance with Third Pillar's
> confidentiality obligations under applicable
> agreements with Customer [DLL], but Customer
> agrees that Third Pillar shall be free to
> develop and commercially exploit software
> that implements the Requirements Information
> without restriction unless otherwise agreed
> between the parties in writing in the future.

Third Pillar's outside counsel Devin Smith at Nixon Peabody
drafted this language.  It was adopted without negotiation or
alteration.

On August 4, 2005, the parties executed Task Order 5,
which superseded Task Order 2.[5]  Under Task Order 5, Third Pillar
was required to:

> Design, develop, and deliver to DLL software,
> databases and software systems with complete
> functionality meeting all of the DLL Global
> Beacon Project Front-End requirements
> ("Requirements") as documented in (and judged
> against) the Use Cases and HTML prototype as
> mutually signed off on at the conclusion of
> CRP [Conference Room Pilot] 3.

DLL attached its global requirements to Task Order 5.  The
parties also memorialized a Software Development Life Cycle,
which discussed Third Pillar's specific obligations to manage the
software configurations and rules.  Under Task Order 5, DLL
remained responsible for drafting the use cases, while Third

_____

5.  Task Order 2 was confined to work done for DLL's facility
based in Wayne, Pennsylvania.  Subsequent to the signing of Task
Order 2, DLL changed the scope of the Beacon project to include
its global operations.  DLL and Third Pillar entered into Task
Order 5 in order to amend the scope of the project.

Pillar was obligated to provide "technical resources with knowledge of the Third Pillar software module functionality."

Task Order 5 included a modified intellectual property clause, which stated:

> Notwithstanding anything set forth in the body of the Agreement to the contrary, except with respect to Customer-Retained Work Product (as defined below), Third Pillar shall own and have the right to re-use in other client engagements all Work Product (as such term is defined in the Agreement) and other designs, specifications, inventions, works, improvements, know-how, techniques, materials, flow charts, notes, outlines, lists, compilations, works, writings, pictorial materials, schematics and other items, created, developed or supplied by Third Pillar in connection with this Task Order ("Third Pillar Work Product").

The Task Order also contained a new definition of Customer-Retained Work product as follows:

> (i) Work Product that implements requirements provided by Customer under this Task Order if Customer expressly notifies Third Pillar in writing that Customer desires to obtain ownership of such requirements and not permit Third Pillar to use in implementations of Third Pillar's LoanPath software for other customers,
> (ii) the design of any existing client/dealer user interface,
> (iii) the logos and other branding elements applied to the client/dealer user interface, [and]
> (iv) credit or behavioral scoring models, designs, specifications or processes.

As to DLL's Customer-Retained Work Product, Task Order 5 stated:

> Third Pillar acknowledges and agrees that the Customer-Retained Work Product has been specially ordered and commissioned by DLL, and that all Customer-Retained Work Product shall be considered work made for hire, as defined under U.S. copyright law, and DLL

> shall own all right, title and interest
> therein. ... Except to the extent expressly
> stated in this Task Order or the Agreement,
> DLL reserves any and all right, title and
> interest in and to the Customer-Retained Work
> Product.  Third Pillar shall deliver to DLL,
> within fourteen (14) days of any request by
> DLL therefor, a copy of any and all Customer-
> Retained Work Product, in any and all forms,
> formats, and media then existing ...
> (including, without limitation, software
> source code).

Finally, under Task Order 5, DLL and Third Pillar agreed to engage in a twelve-week "JUMP" session where DLL employees would travel to Third Pillar's offices in order to "jump-start" the drafting of the remaining use cases.

In early 2006, Third Pillar had not yet delivered any software to DLL because the DLL-prepared use cases lacked sufficient technical detail to prepare the software.  On January 12, 2006, DLL and Third Pillar entered into an agreement (the "Amendment Agreement") for Third Pillar to provide "no more than 4,500 hours of additional work, support, assistance, and cooperation as requested by Customer in order to develop, document, and finalize all Use Cases..."  Under the Amendment Agreement, Third Pillar would be able to provide additional technical guidance to DLL employees so that the use cases would be specific enough for Third Pillar engineers then to create the Beacon software.

The Amendment Agreement also contained an option for DLL to purchase the LoanPath source code through an attached Source Code and Object Code Software License Agreement ("Source Code Agreement").  Unlike previous agreements, which gave DLL

merely the "executable" version of the software, the Source Code Agreement allowed DLL to purchase the human-readable code of the LoanPath software so that DLL could make in-house modifications and enhancements. Third Pillar also agreed to place the LoanPath source code, as modified during the Beacon project, into an Iron Mountain escrow account.

In August 2006, Third Pillar delivered the first software to DLL. When DLL tested the software, its employees discovered that certain parts appeared to be hard coded rather than configured as had been previously presented.

Third Pillar did not deliver complete software at any point in 2006 or 2007, although it did begin to make deposits of partial software builds into an escrow account, set up with the Iron Mountain company for DLL's benefit. In addition, Third Pillar missed multiple testing milestones. In 2008, Third Pillar had still not delivered an end-to-end functioning prototype of the LoanPath software.

On November 14 2008, DLL exercised its option to lease the Beacon Source Code from Third Pillar. DLL then sent a technical team, led by Michael Kovach, to Third Pillar's offices for one month to accomplish a "knowledge transfer" so that DLL employees could work with the Beacon source code and software. In December 2008, after DLL acquired the Beacon source code from Third Pillar, it hired Java software expert Susan Spielman to

review the code.[6]  After several months of intensive review,
Spielman reported that the Beacon software was hard-coded to
contain the entirety of the Beacon use cases.

On May 29, 2009, DLL filed this lawsuit.  On the same
day, DLL sent a letter to Third Pillar stating:

> Pursuant to Task Order No. 5 and Task Order
> No. 2, DLL hereby notifies Third Pillar that
> DLL desires to retain ownership of all work
> product implementing its requirements
> provided to Third Pillar under Task Order No.
> 2 and Task Order No. 5, and that DLL does not
> permit Third Pillar to use this category of
> Customer-Retained Work Product in
> implementation of its LoanPath software for
> any other customers.

The letter also demanded delivery of a copy of all Customer-
Retained Work Product to DLL within fourteen days.

## II.

In assessing the merits of a request for injunctive
relief in a diversity action, federal courts generally will apply
state law.  See Lauf v. E.G. Shinner & Co., 303 U.S. 323, 327-28
(1938).  The parties agree that the contracts in issue are
governed by the law of California.

The California Civil Code dictates that a permanent
injunction may be granted where:  (1) pecuniary compensation
would not afford adequate relief; (2) it would be extremely
difficult to ascertain the amount of compensation which would
afford adequate relief; (3) the restraint is necessary to prevent
a multiplicity of judicial proceedings; or, (4) the obligation

---

6.  The LoanPath software was written in Java, a popular software
language.

arises from a trust.  See Cal. Civ. Code § 3422.  Under both
common law and the California Uniform Trade Secrets Act
("CUTSA"), a plaintiff may seek to enjoin actual or threatened
misappropriation of a trade secret until the trade secret ceases
to exist.  See Cal. Civ. Code § 3426.2(a); Nalley's Inc. v.
Corona Processed Foods, Inc., 240 Cal. App. 2d 948, 952 (Cal.
Ct. App. 1966).  However, a remote threat of misuse or disclosure
does not justify enjoining the possible misuse or disclosure.
See Central Valley Gen. Hosp. v. Smith, 162 Cal. App. 4th 501,
532 (Cal. Ct. App. 2008).

    California courts have typically found that § 3422
requires a plaintiff to show irreparable harm before a permanent
injunction may issue.  See, e.g., DVD Copy Control Ass'n v.
Kaleidescape, Inc., 97 Cal. Rptr. 3d 856, 876 (Cal. Ct. App.
2009); Syngenta Crop Prot., Inc. v. Helliker, 138 Cal. App. 4th
1135, 1167 (Cal. Ct. App. 2006).  Such irreparable harm may be
established "where there is an inability to ascertain the amount
of damages."  Kaleidescape, 97 Cal. Rptr. 3d at 876.

    A court, however, may not presume irreparable harm,
especially when all alleged misappropriation has occurred in the
past.  See DVD Copy Control Ass'n v. Bunner, 10 Cal. Rptr. 3d
185, 191-92 (Cal. Ct. App. 2004).  A plaintiff may only prevail
if there is a substantial threat of impending harm, which does
not extend to mere possession by the misappropriating party.  See
FLIR Systems, Inc. v. Parrish, 95 Cal. Rptr. 3d 307, 316-17 (Cal.
Ct. App. 2009).  Furthermore, a failure to specify which trade

secrets are generally known to the public and which are not generally known to the public or to those that might benefit economically from them can result in a court's refusal to grant the injunction.  See Syngenta, 138 Cal. App. at 1173.

Finally, under the CUTSA, where it would be unreasonable for a court to enjoin the defendant's future use of the trade secret, the court may instead order the defendant to pay royalties to the plaintiff for no longer than the period of time the court could have prohibited the use.  See Cal. Civ. Code § 3426.2(b).

In the complaint, DLL alleges claims for breach of contract, violation of the CUTSA, unjust enrichment, and promissory estoppel.  DLL has alleged numerous breaches of contract by Third Pillar of their various contracts.  DLL argues that Third Pillar failed to deliver the Beacon project source code in its correct format.  DLL also asserts ownership of the 53 Beacon use cases that DLL drafted during the Beacon project and the Beacon source code and asserts that Third Pillar has unlawfully re-used them with another customer.[7]  DLL also alleges that Third Pillar has violated the CUTSA by using DLL's trade secrets, which are found in 22 of the Beacon use cases.  Finally,

---

7.  Due to confidentiality agreements and business considerations, we will not reveal the identity of Third Pillar's other customers.  This customer is a competitor to DLL in the vendor financing market.  We shall refer to this customer as Tuscany, which was Third Pillar's internal name for the customer's software design project.

DLL has pleaded in the alternative state law claims for unjust enrichment and promissory estoppel.

III.

We now turn to DLL's claim for breach of contract. First, it asserts that Third Pillar breached their contracts by making unlawful use of the Beacon use cases. Second, DLL contends that Third Pillar has breached its contractual obligations by making unlawful use of the Beacon source code.

Under California law, the elements of a claim for breach of contract are: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages. See Wall St. Network, Ltd. v. N.Y. Times Co., 80 Cal. Rptr. 3d 6, 12 (Cal. Ct. App. 2008). There is no dispute in this case that DLL and Third Pillar entered into the Services Agreement and the two associated agreements called Task Orders 2 and 5. Both parties agree that these contracts are valid and enforceable. There is also no dispute that DLL performed its contractual obligations by paying Third Pillar for the work performed under the contract.

It is the province of the court under California law to interpret contracts so as to give effect to the parties' mutual intent as it existed at the time when the contract was formed. See Cal. Civ. Code § 1636; AIU Ins. Co. v. Sup. Ct., 799 P.2d 1253, 1264 (Cal. 1990). "Such intent is to be inferred, if possible, solely from the written provisions of the contract. The 'clear and explicit' meaning of these provisions, interpreted

-16-

in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage', controls judicial interpretation." Id. (citations omitted).

California has adopted a parol evidence rule that bars the introduction of extrinsic evidence to vary, alter, or add to the terms of an integrated written instrument. See Cal. Civ. Code §§ 1625, 1856. The rule does not, however, prevent "the introduction of extrinsic evidence to explain the meaning of a written contract ... [if] the meaning urged is one to which the written contract terms are reasonably susceptible." Casa Herrera, Inc. v. Beydoun, 83 P.3d 497, 502 (Cal. 2004). When parol evidence is offered to explain a written agreement, the court must first decide whether the agreement is fully integrated and then must ask whether the agreement is reasonably susceptible to the meaning asserted for by the party offering the evidence. See Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., 442 P.2d 641(Cal. 1968); Masterson v. Sine, 436 P.2d 561 (Cal. 1968). So long as the proffered evidence does not vary, alter or add to the written terms, it will be admitted if it proposes a meaning to which the written terms are reasonably susceptible.

The Services Agreement provides that:

This Agreement and all Task Orders
referencing this Agreement shall constitute
the complete agreement between the parties
and supercedes all previous agreements or
representations, written or oral, with
respect to the subject matter hereof.  This

> Agreement may not be modified or amended
> except in a Task Order or other writing
> singed by a duly authorized representative of
> each party.  It is expressly agreed that any
> terms and conditions of any purchase order or
> similar instrument of Customer shall be
> superceded by the terms and conditions of
> this Agreement to the extent that such terms
> may be in conflict.

We find that the Services Agreement, in conjunction with

Amendment 1 and Task Orders 2 and 5, are fully integrated

documents.  Thus, the court will only consider extrinsic evidence

to the extent that it offers a reasonably susceptible

interpretation of a contractual term, but not one that varies,

alters, or adds to the terms on the face of the contract.

DLL asserts that Third Pillar breached their contracts

by making unlawful use of the Beacon use cases and source code.

According to DLL, it was the only drafter of the Beacon use cases

and retained sole ownership of them under the provisions of the

Services Agreement.  DLL maintains that it also  owns the Beacon

source code because the source code is a direct translation of

its use cases into software form.  Third Pillar disagrees.  It

argues that the contracts with DLL gave it ownership of all work

product generated during the Beacon Project, including the use

cases and resulting source code.

The Services Agreement sets forth the general terms for

the parties' expected business relationship, and it contained an

overarching intellectual property clause that was to apply to all

future work unless otherwise agreed.  With some exceptions, the

Services Agreement sets forth in § 10.2 that DLL would be the

owners of any work performed by Third Pillar.  Section 10.2
provides that all work done by Third Pillar would be "works made
for hire," belonging to DLL, "except as otherwise set forth in a
Task Order."

The Services Agreement also contains, in §§ 11.1-11.5,
a definition of "Confidential Information" and a nondisclosure
agreement by both parties.  Confidential Information is any
information designated as confidential or reasonably expected by
its nature to be kept confidential.  Excluded was publicly
available information or information gained through independent
sources.  DLL and Third Pillar agreed "not [to] make each other's
Confidential Information available in any form to any third party
or to use each other's Confidential Information for any purpose
other than the implementation of this Agreement."

The Services Agreement, however, contemplated that the
ownership may be changed in future Task Orders.  It states,
"*Except as otherwise set forth in a Task Order*, Customer [DLL]
shall retain all right, title and interest in and to all Customer
materials, content and information supplied by Customer to Third
Pillar..." (emphasis added).  DLL argues that no reversal of
ownership occurred since the Services Agreement stated that, "in
the even of a conflict between the terms of the body of this
Agreement and the terms and conditions set forth in a Task Order,
the terms set forth in the body of this Agreement shall control."

DLL is incorrect.  The Services Agreement specifically
states that Task Orders may amend the intellectual property

-19-

provisions. Therefore, the intellectual property clause in Task Order 5 is not in conflict with the terms of the Services Agreement and governs all work performed under them. We find that Task Order 5 changed the presumption that DLL was the owner of all of Third Pillar's work product on the Beacon project. Each Task Order included an intellectual property provision that makes Third Pillar the owner of all work product generated during the Beacon project, except for specially carved-out categories of "Customer-Retained Work Product."

DLL also argues that the use cases properly belong to it under § 10.1 of the Services Agreement and the Task Orders because the use cases are Customer Proprietary materials and not Third Pillar work product. DLL contends that, because its employees drafted all of them, the use cases are content supplied to Third Pillar by DLL and can be designated as Customer Proprietary Materials, whose ownership was retained by DLL, and not Third Pillar Work Product, which Third Pillar owns under the terms of Task Order 5.

We disagree with DLL's interpretation of work product as defined in the intellectual property clauses of the Task Orders. The intellectual property clause of Task Order 5 provides that,

> Notwithstanding anything set forth in the
> body of the Agreement to the contrary, except
> with respect to Customer-Retained Work
> Product (as defined below), Third Pillar
> shall own and have the right to re-use in
> other client engagements all Work Product (as
> such term is defined in the Agreement) and
> other designs, specifications, inventions,

works, improvements, know-how, techniques, materials, flow charts, notes, outlines, lists, compilations, works, writings, pictorial materials, schematics and other items, created, developed or supplied by Third Pillar in connection with this Task Order ("Third Pillar Work Product").

It grants to Third Pillar both "all Work Product (as such term is defined in the Agreement)" and all "Third Pillar Work Product." It grants to DLL only the "Customer-Retained Work Product (as defined below)." We conclude that the Task Orders grant the ownership of all work product generated under the aegis of the Beacon project to Third Pillar, not just work product produced by Third Pillar. Since the use cases were explicitly drafted as part of the Beacon project, they constitute work product belonging to Third Pillar under the intellectual property clauses of the task orders.

In short, unless work product falls under one of the exceptions in subsections (i) through (v) of the intellectual property clause in Task Order 5, it belongs to Third Pillar, and Third Pillar may make commercial use of it in engagements with other customers. Subsections (i) through (v) of Task Order 5 designate certain work product generated during the Beacon project as Customer-Retained Work Product. This work product is defined as "work made for hire" in Task Order 5, and DLL owns such work product and any of its derivatives.

In the alternative, DLL argues that it obtained ownership of the source code by giving notice in its May 29, 2009 letter under subsection (i) of the intellectual property

provisions in Task Orders 2 and 5.[8]  Subsection (i) provides

that, "Work Product that implements requirements provided by

Customer under this Task Order if Customer expressly notifies

Third Pillar in writing that Customer desires to obtain ownership

of such requirements and not permit Third Pillar to use in

implementations of Third Pillar's LoanPath software for other

customers."  Third Pillar contends that DLL's attempt to obtain

ownership of the use cases and source code by giving notice under

subsection (i) of Task Orders 2 and 5 fails as untimely.

Subsection (i) is an option under California law.  See

Hayward Lumber & Inv. Co. v. Constr. Prods. Corp., 255 P.2d 473,

478 (Cal. 1953).  It does not contain a specific deadline by

which DLL was required to exercise the option, and thus any

exercise of the option must be made within a "reasonable time."

See Lohn v. Fletcher Oil Co., 100 P.2d 505, 508 (Cal. 1940); see

also Cal. Civ. Code § 1647.  The definition of a reasonable time

is "ordinarily one of fact, to be determined from all the

circumstances of the particular case.  Where the facts are not

disputed, the question is one of law."  Alpern v. Mayfair

Markets, 258 P.2d 7, 10 (Cal. 1953).  In making such a

determination, courts are to consider, among other factors:  (1)

the conduct of the parties; (2) delay in exercising the option;

(3) any acquiescence as to the delay; (4) whether the delay was

motivated by unfair purposes; (5) the parties' interpretation of

---

8.  Subsection (i) is identical in both Task Orders 2 and 5.

the contract; and (6) whether the optionee attempted to act in a manner so as to cause no harm to the other party.  See id.

DLL maintains that giving notice on May 29, 2009, the date it filed this lawsuit, was within the reasonable time to exercise its option to obtain ownership of all Beacon work product.  Task Order 2 containing this option was signed on November 30, 2004, and Task Order 5, which superseded Task Order 2 but contained the same language, was signed on August 4, 2005. The information that DLL disclosed to Third Pillar was provided by DLL in the form of the use cases over a course of three years, from 2004 through 2006.  DLL at all times deemed it to be highly sensitive and proprietary.

DLL knew that Third Pillar intended to market its work product to other parties, both during and after its engagement on the Beacon project.  Such intent to market the product was explicitly stated and ratified in the November 30, 2004 Amendment to the Services Agreement.  The Amendment provided that "[DLL] agrees that Third Pillar shall be free to develop and commercially exploit software that implements the Requirements Information without restriction unless otherwise agreed between the parties in writing in the future."

We find persuasive the email from Daniel Brennan, a DLL consultant, to Rita DiMartino, the deputy chief operating office for DLL.  Brennan advised DiMartino of the intellectual property provisions of the contracts and acknowledged that any notice under subsection (i) must be given early in the software

development process, prior to "detail design work."  Similarly,
we find the email from Scott Phelps, the Vice-President of Global
e-Commerce at DLL, to DiMartino, Kevin McManus, and Jim Martinko
to support this position.  Phelps stated that DLL would be
required to provide notice under subsection (i) "at the time of
the use case."  Despite Phelps's later testimony, this statement
demonstrates that DLL understood that it was to give notice when
it initially disclosed to Third Pillar its detailed business
processes during use case development.

        Under all the circumstances, DLL's exercise of its
option on May 29, 2009, under subsection (i) of the intellectual
property clause in Task Orders 2 and 5, was not within a
reasonable time.  Subsection (i) allows DLL to own "Work Product
that implements requirements provided by Customer under this Task
Order if Customer expressly notifies Third Pillar in writing that
Customer desires to obtain ownership of such requirements and not
permit Third Pillar to use in implementations of Third Pillar's
LoanPath software for other customers."  It was unreasonable for
DLL to retract Third Pillar's ability to re-use its work years
after the information was provided by DLL given the time-
intensive nature of the Beacon software development and the
highly-detailed proprietary nature of the information DLL knew
would be incorporated into a publically-marketed platform.  We
find that DLL's May 29, 2009 letter was too late and thus
ineffective to obtain ownership of all Beacon work product under

subsection (i) of the intellectual property provisions in Task Orders 2 and 5.

Thus, the work product generated on the Beacon project, including both the use cases and resulting source code, belonged to Third Pillar with the exception of the work product outlined in subsections (ii) through (v) of the intellectual property clauses in Task Order 5.  In contrast to subsection (i), these subsections assigned immediate ownership to DLL of all work product covered under those sections. DLL takes the position that it always retained ownership of the portion of the source code based on seventeen distinct use cases under subsections (ii) and (iv) of the intellectual property clause in Task Order 5 and that these use cases constituted Confidential Information under §11.1 of the Services Agreement.

Subsection (ii) of the intellectual property clause in Task Order 5 provides that DLL retain ownership of work product containing "the design of the client/dealer user interface."  The client/dealer user interface consists of the software screens that a DLL vendor would access while processing a customer's credit application for DLL.  DLL argues that subsection (ii) grants them ownership rights in seven use cases that, as a whole, outline the structure of the client/dealer user interface, as well as the source code built from those use cases.  The seven use cases are:  (1) Create Credit Application; (2) Leasing (Pricing) Quote; (3) Template Maintenance; (4) Rate Card Generation; (5) Partner Self-Service Credit Application; (6)

Partner Self-Service Lease Quote; and (7) Partner Self-Service Buyout and Trade-Up Quote.  Third Pillar contends that subsection (ii) covers only the physical layout or graphic design of the software used by DLL's partners to the extent that it is not based on publically-available standards, such as the Oracle Browser Look and Feel standards.

We agree with DLL that subsection (ii) grants DLL ownership of any work product that details the structure of a client/dealer user interface, that is, what screens a DLL vendor will see and the specific order of the processes through which the software will lead them.  We give credit to the testimony of Scott Phelps that all seven of these use cases contain such information.  Phelps has worked for DLL since 1996 and currently serves as its Vice-President of Global e-Commerce.  He managed the portion of the Beacon process which drafted the use cases for Third Pillar and worked to integrate the LoanPath software with existing DLL processes.  He has had twenty-five years of experience in software implementation throughout his career.

Having reviewed these use cases and credited Phelps's testimony, we find that these seven use cases properly belong to DLL.  DLL owns the following use cases under subsection (ii) of the intellectual property clause of Task Order 5:  (1) Create Credit Application; (2) Leasing (Pricing) Quote; (3) Template Maintenance; (4) Rate Card Generation; (5) Partner Self-Service Credit Application; (6) Partner Self-Service Lease Quote; and (7) Partner Self-Service Buyout and Trade-Up Quote.  These seven use

cases also constitute Customer Proprietary materials under § 10.1
of the Services Agreement and Confidential Information under
§ 11.1 of the Services Agreement.  Furthermore, DLL owns all the
source code generated from these seven use cases.

In addition to the work product that DLL owns under
subsection (ii), DLL contends that it owns all work product under
subsection (iv), that is, the following use cases and the
resulting source codes:  (1) Contract Setup Validation and
Booking and Funding; (2) Create Credit Application; (3) Manual
Credit Review and Decision; (4) Automated Credit Review and
Decision; (5) Partner Qualification; (6) Application Maintenance
(a/k/a Appeals); (7) Integral Client View; (8) Portfolio
Acquisition; (9) Pre-Qualification; (10) Partner Self-Service
Credit Application.  Third Pillar disagrees that any of these use
cases properly fall within the ambit of subsection (iv). It
maintains that subsection (iv) grants DLL ownership of only the
scoring models found in its CADS and ATS systems and the LoanPath
interfaces to those systems.

Subsection (iv) provides that DLL owns all work product
containing, "credit or behavioral scoring models, designs,
specifications or processes."  DLL and Third Pillar make
conflicting arguments on the grammar and interpretation of this
language.  DLL contends that it should be read to mean, "*credit
or behavioral* scoring models, *credit or behavioral* designs,
*credit or behavioral* specifications or *credit or behavioral*
processes."  DLL maintains that this phrase grants them ownership

of ten Beacon use cases that encompass their "credit process." Third Pillar, on the other hand, interprets the phrase more narrowly as reading, "*credit or behavioral _scoring_ models, credit or behavioral _scoring_ designs, credit or behavioral _scoring_ specifications or credit or behavioral _scoring_ processes.*" The language of subsection (iv) alone provides inadequate guidance as to the correct meaning. Under the California laws of contract interpretation, we may consider parol evidence "[if] the meaning urged is one to which the written contract terms are reasonably susceptible." Casa Herrera, Inc. v. Beydoun, 83 P.3d 497, 502 (Cal. 2004). We have carefully reviewed the testimony and evidence presented by both parties on the construction of subsection (iv).

We credit the testimony of Daniel Brennan, a DLL consultant for the Beacon project, that the parties attempted to define subsection (iv) broadly because they were not yet sure about what information would be incorporated into the use cases and that DLL sought to protect its "credit processes" as a whole. Rita DiMartino, Scott Phelps, and other DLL employees also testified that DLL considered its credit application process to be a differentiator in the market of vendor financing. We accept the testimony of Phelps, DLL Vice-President of Global e-Commerce, that during the negotiations for Task Order 2 he informed Charles Stuard, a Third Pillar account manager, that DLL sought to protect this competitive advantage under subsection (iv).

Third Pillar contends that there is no such term as "credit process" used in the vendor finance industry. We disagree. Pankaj Chowdhry, Third Pillar's President, repeatedly referred to DLL's "credit process" throughout his testimony in court and in his deposition, as a term of art commonly used by the parties.

Based on its language and the testimony presented at trial, we find that subsection (iv) was understood by the parties to grant DLL ownership of all work product containing, "credit or behavioral scoring models, credit or behavioral designs, credit or behavioral specifications or credit or behavioral processes." We determine that it was meant to protect DLL's process for deciding which customers were credit-worthy, how to structure their financing based on their credit and behavioral information, and the particular DLL business processes that allowed it to make credit decisions both more accurately and more quickly than its competitors. This ownership by DLL includes the kinds of information DLL would need to collect from a customer. It also includes which person at DLL would see that information and in what order, what agencies DLL contacted for credit and behavioral information, when and how decisions were to be reviewed, and other similar kinds of information.

We have reviewed the ten use cases that DLL contends fall within subsection (iv), and we find that six of them properly belong to DLL. DLL owns the following use cases under subsection (iv) of the intellectual property clause of Task Order

5:  (1) Automated Credit Review and Decision; (2) Manual Credit Review and Decision; (3) Partner Qualification; (4) Application Maintenance (a/k/a Appeals); (5) Pre-Qualification; and (6) Create Credit Application.  We have also found that the Create Credit Application use case was owned by DLL under subsection (ii).  These six use cases also constitute Customer Proprietary materials under § 10.1 of the Services Agreement and Confidential Information under § 11.1 of the Services Agreement.  In addition, DLL owns all the source code generated from these six use cases.

DLL has alleged breaches of contract for re-use of the use cases and source code with Third Pillar's Tuscany customer. We find that Third Pillar did make two of the use cases owned by DLL, Template Maintenance and Partner Qualification, available to its Tuscany customer.  DLL has produced Third Pillar's Tuscany use cases.  They are nearly identical to the Beacon use cases drafted during Third Pillar's work on LoanPath for DLL.  No Third Pillar employee testified as to any changes made to the Beacon use cases prior to their use in the Tuscany project with the exception of removing DLL's name.  They are replete with references to DLL-specific positions, employees, and customers. Moreover, Third Pillar's President, Pankaj Chowdhry admitted that at least fifteen Beacon use cases were re-used for the Tuscany project, including its Template Management and Partner Qualification use cases.  This re-use of at least two DLL-owned use cases constitutes a breach of the Services Agreement §§ 10.1

and 11.1, which require Third Pillar to keep confidential DLL's Customer Proprietary Materials and Confidential Information.

We also find that Third Pillar breached the Services Agreement by using the source code developed from the twelve DLL-owned use cases in their Tuscany release of LoanPath. We accept the testimony of Susan Spielman, a Java expert hired by DLL, that the Tuscany LoanPath software contained at minimum twenty-three complete Beacon use cases, including all twelve of the DLL-owned use cases. Third Pillar argues that this use does not constitute a breach because these functions were "turned off" through run-time conditionals and post-build scripts. We find this argument to be unpersuasive. Regardless of whether Third Pillar's Tuscany customer can currently access the functions in the DLL-owned use cases, the Tuscany LoanPath software includes them. Because these use cases remained coded in the LoanPath source code, Third Pillar breached its agreements with DLL by re-useing LoanPath for its Tuscany customer.

Accordingly, we find that Third Pillar's re-use of the following DLL use cases, in both written and software form, constitutes breach of contract: (1) Create Credit Application; (2) Leasing (Pricing) Quote; (3) Template Maintenance; (4) Rate Card Generation; (5) Partner Self-Service Credit Application; (6) Partner Self-Service Lease Quote; and (7) Partner Self-Service Buyout and Trade-Up Quote; (8) Automated Credit Review and Decision; (9) Manual Credit Review and Decision; (10) Partner

Qualification; (11) Application Maintenance (a/k/a Appeals); and (12) Pre-Qualification.

IV.

We now turn to DLL's claim for misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA"). The CUTSA provides a cause of action, in addition to a claim for breach of contract, if a plaintiff possessed a trade secret and a defendant uses or threatens to use that trade secret in breach of an agreement, confident or duty. <u>See</u> Cal. Civ. Code § 3426 et seq. Here, DLL argues that twenty-two of its use cases constitute trade secrets, which Third Pillar has misappropriated and threatens to further misappropriate in violation of the CUTSA. Since we have found that Third Pillar owns ten of those twenty-two use cases, it has not violated the CUTSA as to those ten.

We focus on the remaining twelve use cases that belong to DLL. As noted above, they are: (1) Create Credit Application; (2) Leasing (Pricing) Quote; (3) Template Maintenance; (4) Rate Card Generation; (5) Partner Self-Service Credit Application; (6) Partner Self-Service Lease Quote; and (7) Partner Self-Service Buyout and Trade-Up Quote; (8) Automated Credit Review and Decision; (9) Manual Credit Review and Decision; (10) Partner Qualification; (11) Application Maintenance (a/k/a Appeals); and (12) Pre-Qualification.

The CUTSA defines a trade secret as,

> information, including a formula, pattern, compilation, program, device, method,

-32-

technique, or process, that (1) derives
independent economic value, actual or
potential, from not being generally known to
the public or to other persons who can obtain
economic value from its disclosure or use;
and (2) is the subject of efforts that are
reasonable under the circumstances to
maintain its secrecy.

Cal. Civ. Code § 3426.1(d). The CUTSA defines misappropriation
to include:

Disclosure or use of a trade secret of
another without express or implied consent by
a person who, at the time of disclosure or
use, knew or had reason to know that his or
her knowledge of the trade secret was
acquired under circumstances giving rise to a
duty to maintain its secrecy or limit its
use.

Cal. Civ. Code § 3426.1(b)(2)(B)(ii) (2009). Threatened
misappropriation has been found to mean "a threat by a defendant
to misuse trade secrets, manifested by words or conduct, where
the evidence indicates imminent misuse." FLIR Sys., Inc. v.
Parrish, 95 Cal. Rptr. 3d 307, 316 (Cal. App. Ct. 2009); see also
Central Valley Gen. Hosp. v. Smith, 75 Cal. Rptr. 3d 771, 791
(Cal. App. Ct. 2008). Under the CUTSA, a plaintiff may seek
injunctive relief from both actual and threatened
misappropriation. See Cal. Civ. Code § 3426.2(a).

We must first determine whether DLL's twelve use cases
constitute trade secrets under the CUTSA. California courts have
held that independent economic value needs to be "more than
trivial," although it does not need to be "great." See Yield
Dynamics, Inc. v. TEA Sys. Corp., 66 Cal. Rptr. 3d 1, 18 (Cal.
Ct. App. 2007). Such value can be measured by the value of the

information to competitors or by the resources expended to develop the trade secret.  See Whyte v. Schlage Lock Co., 125 Cal. Rptr. 2d 277, 288 (Cal. Ct. App. 2002); Courtesy Temp. Serv., Inc. v. Camacho, 272 Cal. Rptr. 352, 357 (Cal. Ct. App. 1990).

We find that DLL's use cases are processes that derive independent economic value from not being generally known to the public.  While each individual step in the use cases may be a matter of common practice in the industry, DLL's particular combination and order of steps creates a unique system in each use case.  California courts have consistently recognized the validity of such combination trade secrets.  See O2 Micro Intern. Ltd. v. Monolithic Power Sys., 420 F. Supp. 2d 1070, 1089-90 (N.D. Cal. 2006); By-Buk Co. v. Printed Cellophane Tape Co., 163 Cal. App. 2d 157, 166 (1958); see also Vt. Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 147, 149 (2d Cir. 1996) (applying California law).

We find believable the testimony of DLL employees Rita DiMartino, James Martinko, Jim McCann, and Dan Milone that these processes for making fast and reliable credit decisions differentiate DLL from competitors in the vendor finance field. If competitors were to obtain these highly detailed use cases, they could essentially replicate DLL's business strategy and eliminate DLL's competitive advantage in the field. Furthermore, we credit the testimony of Martinko and Milone that the development of the use cases took ten full-time employees

-34-

over two years to complete.  This expenditure of time and money by DLL substantiates DLL's claim that they have independent economic value.

California courts have found that the determination of reasonable efforts to maintain secrecy requires a fact-intensive analysis.  See DVD Copy Control Ass'n v. Bunner, 10 Cal. Rptr. 3d 185, 193 (Cal. Ct. App. 2004).  Reasonable efforts have been found to include such practices as "advising employees of the existence of a trade secret, limiting access to the information on a 'need to know basis,' requiring employees to sign confidentiality agreements, and keeping secret documents under lock."  Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., 923 F. Supp. 1231, 1254 (N.D. Cal. 1995); see also Schlage Lock Co., 125 Cal. Rptr. 2d at 286-87; MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1993); Courtesy Temp. Serv., 272 Cal. Rptr. at 358.  Where a plaintiff has freely disclosed the information without the protection of a confidentiality agreement, it cannot claim a trade secret.  See Religious Tech. Ctr., 923 F. Supp. at 1254.

We find that DLL made reasonable efforts to maintain the secrecy of these twelve use cases.  All DLL employees, contractors, consultants and vendors, including those who worked on drafting the use cases, were required to sign confidentiality agreements.  DLL provided the use cases to Third Pillar under the Confidential Information clauses of the Services Agreement, §§ 11.1-11.5.  These clauses prohibited Third Pillar from re-

using or divulging any Customer Proprietary information learned in the course of the Beacon project. DLL also protected the use cases by retaining ownership of them under subsections (ii) and (iv) of the intellectual property clause in Task Order 5, which prohibited their re-use with other parties. Indeed, Third Pillar marked the Beacon use cases as "Confidential" on each and every page when DLL drafted them during the Beacon project and showed DLL these markings. Such measures were reasonable under the circumstances to maintain the secrecy of this information.

We find that the twelve use cases owned by DLL constitute trade secrets under California Civil Code § 3624.1(d): (1) Create Credit Application; (2) Leasing (Pricing) Quote; (3) Template Maintenance; (4) Rate Card Generation; (5) Partner Self-Service Credit Application; (6) Partner Self-Service Lease Quote; and (7) Partner Self-Service Buyout and Trade-Up Quote; (8) Automated Credit Review and Decision; (9) Manual Credit Review and Decision; (10) Partner Qualification; (11) Application Maintenance (a/k/a Appeals); and (12) Pre-Qualification.

We also find that Third Pillar has misappropriated these trade secrets by divulging them to their Tuscany customer, in both written and source code form, and threatens to misappropriate them further with an additional "Rome" customer.[9] Third Pillar knew that these use cases were acquired under the terms of the Services Agreement, which required Third Pillar to

---

9. As with the Tuscany customer, we shall not divulge the identity of Third Pillar's Rome customers.

keep confidential all Customer Proprietary information. Nonetheless, Third Pillar made these use cases available to its Tuscany customer, a competitor of DLL. Pankaj Chowdhry, Third Pillar's President, admitted that Third Pillar provided the Tuscany customer with at least two, and possibly more, of DLL's use cases in written and source code forms. We also credit the testimony of Susan Spielman, who stated that all twelve of the above-referenced DLL-owned use cases appeared in the Tuscany software. This constitutes actual misappropriation.

Furthermore, Third Pillar's contract with the Tuscany customer provides limited contractual means through which the Tuscany customer may obtain the full source code, which contains coding for all twelve of DLL's trade secret use cases.[10] Third Pillar has also entered a similar contract with its Rome customer, another large-scale competitor of DLL, and has admitted that it is determining which use cases to provide to the Rome customer. This constitutes threatened misappropriation, which is not speculative in nature.

We find that Third Pillar has violated the CUTSA by misappropriating the trade secrets contained in DLL's twelve use cases, in both written and software form, and by threatening further misappropriation, which is not speculative.

---

10. The Tuscany customer would be able to obtain the source code from Third Pillar if Third Pillar went into bankruptcy, if Third Pillar is bought by a competitor to the Tuscany customer, if Third Pillar defaults on any material obligation to provide "Level One" maintenance for the software, or if Third Pillar can no longer offer maintenance and support services.

V.

DLL has also pleaded common law claims for promissory estoppel and unjust enrichment. These claims can only be maintained in the absence of a valid contract governing the conduct at issue. See Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990). We have found that the Services Agreement constitutes a valid contract governing the conduct at issue. We find that DLL's claims for promissory estoppel and unjust enrichment fail. They will be dismissed.

VI.

Having determined that Third Pillar has breached the Services Agreement and violated the CUTSA, we must now decide whether we should enjoin its conduct. As noted above, we will apply California's standards for granting an injunction because DLL's claims are governed by the law of California. See Lauf v. E.G. Shinner & Co., 303 U.S. 323, 327-28 (1938).

The California Civil Code dictates that a permanent injunction may be granted (1) where pecuniary compensation would not afford adequate relief; (2) where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief; (3) where the restraint is necessary to prevent a multiplicity of judicial proceedings; or, (4) where the obligation arises from a trust. See Cal. Civ. Code § 3422.

DLL may only prevail if there is a substantial threat of impending harm, which does not extend to mere possession by the misappropriating party or previous misuse. See FLIR Sys.,

<u>Inc. v. Parrish</u>, 95 Cal. Rptr. 3d 307, 316-317 (Cal. Ct. App. 2009). We find that there is a substantial threat of impending harm based on Third Pillar's contractual obligations to its Tuscany and Rome customers.

First, Third Pillar is currently providing the LoanPath software in an executable version, which includes at least two of DLL's trade secret use cases, to the Tuscany customer. Second, Third Pillar is contractually obligated to give the LoanPath source code, which includes all twelve of DLL's trade secret use cases, to the Tuscany customer in certain circumstances. Third, Third Pillar recently began development of LoanPath for its Rome customer, who is a direct competitor to DLL. Third Pillar had admitted that it intends to provide these twelve use cases to its Rome customer during the course of software development.

Such disclosures will irreparably harm DLL by providing its direct competitors with DLL's trade secret market advantages in vendor financing. Not only would it be difficult, if not impossible, to ascertain the correct amount of compensation for such harm, but we find that mere pecuniary compensation would not afford adequate relief. Such harm will undermine DLL's long-term business strategies and placement in the market. Therefore, we will permanently enjoin Third Pillar from disclosing or re-using for other customers any of the following use cases, in either written or software form: (1) Create Credit Application; (2) Leasing (Pricing) Quote; (3) Template Maintenance; (4) Rate Card Generation; (5) Partner Self-Service Credit Application; (6)

Partner Self-Service Lease Quote; and (7) Partner Self-Service
Buyout and Trade-Up Quote; (8) Automated Credit Review and
Decision; (9) Manual Credit Review and Decision; (10) Partner
Qualification; (11) Application Maintenance (a/k/a Appeals); and
(12) Pre-Qualification.