IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DE LAGE LANDEN OPERATIONAL : CIVIL ACTION
SERVICES, LLC :
:
v. :
:
THIRD PILLAR SYSTEMS, LLC : NO. 09-2439

MEMORANDUM

Bartle, C.J. May 9, 2011

      Before the court is the motion of defendant Third Pillar Systems, LLC ("Third Pillar") to preclude plaintiff De Lage Landen Operational Services, LLC ("DLL") from presenting at trial any opinion evidence of its proposed damages expert Barry Sussman on the subject of reasonable royalties due DLL. Third Pillar maintains that Sussman's opinions are insufficiently reliable under the standards set forth in Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

      DLL filed this diversity action against Third Pillar in which DLL alleges, among other things, trade secret misappropriation under the CUTSA as well as breach of contract. After a three-day permanent injunction hearing,[1] the court found that under DLL's contracts with Third Pillar DLL owned twelve

---

1. The parties had agreed to forego a hearing on a motion for a preliminary injunction and to proceed to a hearing for a permanent injunction.

"use cases," which are detailed step-by-step models of DLL's trade secret business practices that were created in the course of what was called the Beacon project. The court further found that Third Pillar had misappropriated DLL's trade secrets in the twelve use cases that DLL owned, and in doing so, breached its contracts with DLL. The court issued a permanent injunction requiring that Third Pillar "return and/or destroy ... all copies ... of the foregoing twelve Beacon Use Cases."[2] The remainder of the case is now scheduled for trial to begin in May 2011.

> The expert report of Barry Sussman reads:
>
> Based on the materials reviewed, my education and experience as a CPA and a damages expert, and the analysis presented in this report, it is my opinion that:
> a) Based upon the facts and information I reviewed to date, neither DLL's actual loss, nor Third Pillar's unjust enrichment are provable.
> B) DLL is entitled to a reasonable royalty of $6,726,400 for the use of its trade secrets through March 5, 2010.

These opinions are supported by analyses of the vendor financing market, the court determination that Third Pillar had misappropriated twelve DLL-owned trade secret use cases, financial statements of Third Pillar, and the fifteen factors relevant to a reasonable royalty analysis set forth in <u>Georgia-Pacific Corp. v. United States Plywood Corp.</u>, 318 F. Supp. 1116 (S.D.N.Y. 1970).

---

2. DLL also moved for contempt sanctions against Third Pillar for allegedly violating this permanent injunction. After a hearing on the matter, the court found that Third Pillar had violated the permanent injunction and imposed sanctions.

The court has a "gatekeeping" function in connection with expert testimony. See GE v. Joiner, 522 U.S. 136, 142 (1997); see also Daubert, 509 U.S. at 589. It is the task of the trial judge to "ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). This gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Id. at 141. As our Court of Appeals has repeatedly noted, Rule 702 of the Federal Rules of Evidence relating to the testimony of experts embodies three requirements: qualification, reliability, and fit. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).

There is no dispute that Sussman is qualified to render an opinion with respect to what reasonable royalty is due as a result of the misappropriation of a trade secret. Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). He is a Certified Public Accountant and Certified in Financial Forensics (CPA/CFF). He has over twenty years of relevant experience in accounting, financial, and economic analyses. He specializes in advising clients on intellectual property matters, including licensing and royalty agreements. Any opinion, however, must have a factual basis.

To determine reliability, we focus not on the expert's conclusion but on whether that conclusion is "based on the

methods and procedures of science rather than on subjective belief or unsupported speculation."  Schneider, 320 F.3d at 404 (internal quotation marks omitted).  In Kumho Tire, the Supreme Court explained that "the test of reliability is flexible, and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  526 U.S. at 141.  Instead, the court possesses a broad latitude in determining how to determine reliability.  See id. at 142.

The methodology for assessing a reasonable royalty on which DLL relies is found in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Our Court of Appeals adopted this methodology in Trio Process Corp. v. L. Goldstein's Sons, Inc., 612 F.2d 1353, 1357 (3d Cir. 1980).  Under Georgia-Pacific, an expert must assess based on fifteen enumerated factors[3] what royalty a willing buyer and

---

3. Those fifteen factors are:
> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or
> (continued...)

3.(...continued)

     whether they are inventor and promotor.
6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
7. The duration of the patent and the term of the license.
8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.
12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.
13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.
14. The opinion testimony of qualified experts.
15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (<u>at the time the infringement began</u>) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. (emphasis added)

(continued...)

willing seller would have agreed at the time the infringement began or as in this case at the time the misappropriation of trade secrets began.  See Minks v. Polaris Indus., Inc., 546 F.3d 1364, 1372 (Fed. Cir. 2008); Panduit Corp v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (6th Cir. 1978).  Sussman acknowledges in his expert report that "[t]he selection of an appropriate period can be critical in evaluating what information would have been known to the parties during the negotiation.  According to the courts, the hypothetical negotiation should be just prior to the alleged misappropriation."[4]

Sussman selected August 2005 as the appropriate period for the hypothetical negotiation to have taken place, which in his view was just before the misappropriation occurred.  Third Pillar challenges the reliability of Sussman's royalty calculations on the ground that the date of the hypothetical negotiation selected by Sussman is arbitrary.

Sussman's report provides that this hypothetical negotiation would have taken place, "simultaneous[ly] to Task Order 5."  Task Order No. 5 was signed by DLL on August 4, 2005 and by Third Pillar on August 9, 2005 and was an addendum to a Master Professional Services Agreement between the parties dated July 23, 2004.  In Task Order No. 5, Third Pillar agreed to

---

3.(...continued)
Georgia-Pacific, 318 F. Supp. at 1120.

4. Sussman's factor "just before the misappropriation began," we conclude for present purposes is virtually synonymous with "at the time the misappropriation began."

"change its approach" in creating the Beacon software platform for DLL. The Beacon software platform was to be based on use cases written by DLL which detailed DLL's business processes. Some of these business processes were trade secrets, and under their agreements, those use cases were to remain confidential and be used only for work for DLL. Other use cases were not trade secrets, and Third Pillar had a contractual right to re-use those use cases and the software generated from them with their other customers. Thus, in August 2005, it is undisputed that Third Pillar had a contractual right to be in possession of DLL's use cases and to use them for creating the Beacon software platform for DLL.

Sussman testified at his deposition that he believed that the misappropriation began in August 2005 when DLL, pursuant to Task Order No. 5, delivered the trade secret use cases in issue to Third Pillar and Third Pillar then "hard coded" the software including these use cases into its LoanPath product for future use with its customers, including "Tuscany," a Third Pillar customer.

We acknowledge that misappropriation can occur when the wrongdoer uses the trade secret for an unauthorized purpose such as research and development or in preparation for marketing and before the wrongdoer attempts to benefit from it in the marketplace. <u>See</u>, <u>e.g.</u>, <u>02 Micro Int'l Ltd. v. Monolithic Power Systems, Inc.</u>, 399 F. Supp. 2d 1064, 1072 (N.D. Calif. 2005). In support of the August 2005 date on which Sussman relies for

-7-

delivery and the hard coding, DLL references the deposition of Third Pillar president, Pankaj Chowdhry, who testified that Third Pillar was working with Tuscany in "approximately 2005" during the course of the Beacon project in which Third Pillar was engaged with DLL. Even assuming that "approximately 2005" can be construed to mean August 2005 when Task Order No. 5 was signed (a highly doubtful proposition), it does not follow that Third Pillar had hard coded at that time any of the use cases for future use with Tuscany or other customers. While Chowdhry also stated that Third Pillar delivered to Tuscany certain use cases that were developed during the Beacon project, a project that lasted a number of years, he gave no date.

Sussman does not have any information as to when the use cases in issue were written and delivered by DLL to Third Pillar or when Third Pillar began to hard code them. At his deposition, he could not recollect whether delivery would have been in "2005, 2006, 2007." In sum, Third Pillar has pointed to no evidence in the record that any initial misappropriation by Third Pillar occurred in or about August 2005.

As detailed in the court's March 5, 2010 Findings of Fact and Conclusions of Law, Third Pillar clearly misappropriated DLL's trade secret information when it provided to its Tuscany customer at least two DLL-owned trade secret written use cases and software generated from all 12 DLL-owned use cases. However, there was no specific finding as to when this misappropriation

began. Sussman merely knew that Third Pillar's licensing agreement with Tuscany occurred several years later in 2007.

As Sussman conceded, it is critical in opining on the subject of reasonable royalties to identify the point when any misappropriation began. Yet, DLL has not called to the court's attention any evidence to support Sussman's choice of August 2005. Indeed, all Sussman can really say is that it was "only subsequent to this task order [Task Order No. 5] being written that actual use cases were delivered, and trade secrets were actually conveyed to Third Pillar." (emphasis added). See Sussman Dep. 225:4-225:7, Mar. 24, 2011. The analysis of the Georgia-Pacific factors depends on identification of the date of the initial misappropriation. While Sussman attempts to use the correct methodology to determine a reasonable royalty, the absolutely critical starting point, on which everything else depends, is missing. Since his analysis has been made without any factual basis for the time when the misappropriation commenced, Sussman's opinion is not reliable under Daubert and the jury cannot consider it. His opinion as to the reasonable royalties due DLL using the Georgia-Pacific factors is nothing more than speculation. Our Court of Appeals has made it clear that "it is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." Stecyk v. Bell Helicopter Textron, 95 F.3d 408, 414 (3d Cir. 2002).

We find the circumstances here to be analogous to a damage expert in a wrongful death action who is called upon to opine on the future lost wages of a decedent. Even if the expert is a highly qualified economist, knows the wage history of the decedent and generally of those in her profession, is able to figure in inflationary and other pertinent economic data and is familiar with accepted actuarial tables, it will all be for naught if the age of the decedent at the time of her death is absent from the record. Without this vital information, her life expectancy and the number of years she would be expected to work in the future simply cannot be calculated, and thus any expert opinion on her future lost wages would not assist the trier of fact. See Elcock v. Kmart Corp., 233 F.3d 734, 755-56 (3d Cir. 2000). Likewise, the date when the misappropriation of trade secrets began here is vital to any calculation of reasonable royalties. Without it, any opinion rendered by an expert would be speculative and would not assist the trier of fact here.[5] Id.

---

5. DLL points to the report of the counter-damage expert of Third Pillar, James Woods. Early in his report he states, "Mr. Sussman concludes that the hypothetical negotiation would have occurred around August 2005 in connection with the negotiations surrounding Task Order No. 5." Further, he makes clear that he does not accept Sussman's contention that the Georgia-Pacific factors are the correct factors to determine a reasonable royalty in a misappropriation of trade secrets case. Nonetheless, using the August 2005 time period chosen by Sussman and without citing any evidence to support that date, he rejects Sussman's calculation of a reasonable royalty for other reasons. The court does not read his report as providing any basis for finding that Third Pillar began hard coding DLL's use cases in August 2005. As noted above, it is an abuse of discretion to allow any expert
(continued...)

Accordingly, we will exercise our discretion as gatekeeper to exclude Sussman's testimony with respect to DLL's claim for reasonable royalties against Third Pillar. Under the circumstances, there is no need for us to evaluate whether Sussman's testimony is a proper "fit" under <u>Daubert</u>.

The motion of Third Pillar in limine to exclude the opinion of Barry Sussman on reasonable royalties will be granted.

---

5.(...continued)
to base an opinion on factual assumptions for which there is no evidentiary support. <u>See</u> <u>Stecyk</u>, <u>supra</u> at 414. Moreover, the burden of proof is upon DLL to prove a reasonable royalty. Reference to the defendant's expert report of James Woods does not help DLL in this regard.

-11-